COMMONWEALTH *vs.* ALFRED R. VAN LIEW.

Plymouth.  October 18, 1982. — November 10, 1982.

Present: PERRETTA, CUTTER, & KASS, JJ.

*Homicide.  Evidence,* Hearsay, State of mind.  *Practice, Criminal,* Presumptions and burden of proof, Instructions to jury.

Statements made by a murder victim to his wife, outside the presence of the defendant, to the effect that the victim had seen the defendant in the company of a woman and that if the defendant did not pay him a sum of money owed to him he would tell the woman with whom the defendant had been living what he had seen, were properly admitted in evidence at his trial for the limited purpose of showing the victim's state of mind which could then have had relevance to the defendant's motive.  [664-669]

At a murder trial, language in the judge's charge that a person is presumed to intend the natural and probable consequences of his acts could not, when considered as part of the entire charge in the context of the case, reasonably have been understood by the jury as shifting the burden of proof to the defendant and therefore did not create a constitutionally impermissible presumption.  [669-670]

INDICTMENTS found and returned in the Superior Court Department on November 26, 1980.

The cases were tried before *Wagner, J.*

*Willie J. Davis* for the defendant.

*Rosemary Ford,* Special Assistant District Attorney, for the Commonwealth.

CUTTER, J.  This is an appeal from convictions in the Superior Court for the crimes of second degree murder and unlawfully carrying a firearm.  We state below in detail the evidence only so far as necessary to deal with the issues argued.

Van Liew worked as bartender in a Brockton barroom. On October 28, 1980, he was observed by Anthony McNeil, who had entered the barroom about 4 P.M., to pull a gun

from beneath the bar and to fire at least two shots through the back door. Then about fifteen people were present, not including the victim, Raymond Howard. Van Liew, at the end of a pool game, also "jokingly" had broken a pool stick approximately as McNeil had entered. Van Liew told McNeil that he was depressed, he was having "problems with his old lady" who "was leaving," and he "owed . . . some money." Howard came in about 5 P.M. and sat down on a bar stool next to McNeil. About half an hour thereafter another witness, Crystal Walker, entered the barroom and sat down on a desk on the other side of McNeil. Howard offered to buy her and McNeil a drink and was about to pay when McNeil observed Van Liew, behind the bar, pointing his pistol at Howard's chest for "a couple of seconds." The gun went off and many of the then approximately twenty-five to forty people in the barroom left very promptly. Howard said, "I'm shot . . . . Al. Why did you shoot me?" Van Liew (after removing the shells and dropping them behind the bar) handed the revolver to McNeil and told him "to get rid" of it. McNeil then departed with Crystal Walker, taking the revolver with him. Miss Walker later hid the gun. Thereafter McNeil and Miss Walker "showed . . . [the police] where it was."

No testimony disclosed any argument between Van Liew and Howard at the bar except that one witness (Earl Levy) heard Howard say to Van Liew, "You better pay Mirna her five dollars back . . . . [Y]ou know how those sisters are when you owe them money." Levy heard Van Liew reply (with some anger), "Oh, man, shut up. I know I owe her the five dollars."[1] Miss Walker at trial testified that she observed Van Liew pull the trigger although she admitted that earlier she had told the police that the gun just went

---

[1] Levy had seen Van Liew waiving the gun around for two or three minutes and had told him to put it away and to stop playing with it. This was to see that no one would get hurt. There was testimony from at least one witness (Otis Woods) that Van Liew at one time made a noise under the bar, and that Howard had said to the witness that Van Liew had a gun and that "[t]he man is crazy."

off. After the shooting, Van Liew was heard to say, "I didn't know it was loaded."

Howard was put on the floor and Van Liew began to administer "mouth-to-mouth resuscitation." The police soon arrived. Howard was taken to a hospital. Van Liew was taken there also, and there admitted to the police (after receiving Miranda warnings) that he had shot Howard. Howard died at the hospital.[2]

1. Prior to admitting in evidence a statement made shortly before October 28, the day of the shooting, by Howard to his wife, Cynthia, there was an extended hearing on voir dire. The trial judge ruled (subject to appropriate objections) that the statement was admissible (see note 4, infra). Before the jury, Cynthia Howard was allowed to testify that, during the weekend prior to October 28, she had been told by Howard that he had "spotted . . . Van Liew and a young lady, Judy Monteiro, . . . in the vicinity of the Holiday Inn at the Westgate Lounge." He also said to his wife that he had told Van Liew that if the latter "did not pay him [Howard] the money [Van Liew] owed him, he was going to tell" Mrs. Howard's sister, Sheila Langston, with whom (so Mrs. Howard testified) Van Liew had been living for about five years. The trial judge at once told the jury (a) that he later was going to give them further instructions about the statement, and (b) that the "conversation is not to prove the truth of the contents of what is contained in the conversation, but . . . [is] being offered only on the issue of motive . . . . It simply relates to the issue of motive with reference to believability and credibility" and "has a very limited purpose." Defense counsel said he was "satisfied with the cautionary instructions."

---

[2] After Levy had testified, the trial judge put on the record his "understanding" that defense counsel was "moving on the theory of accident, wanton, and reckless conduct." A police expert gave some basis for this theory because he described Van Liew's single-action-only revolver as having "a hair trigger" (once the hammer is cocked back) and as "extremely sensitive" and "very unsafe" with only a "rebound safety."

Although her talk with Howard was on October 25 or October 26, Mrs. Howard did not call her sister until the 28th. Then she told Mrs. Langston of her conversation with Howard about Van Liew and Judy Monteiro and that if Mrs. Langston "wanted to know more about it, she could ask . . . [Mrs. Howard's] daughter, Patricia Gonsalves," who "might know more," as Patricia Gonsalves and Judy Monteiro were friends. Mrs. Langston acknowledged on the stand that she had heard from her sister on the 28th of October and then had called her niece, Patricia Gonsalves, who had told her she knew nothing about Van Liew and Judy Monteiro. Mrs. Langston testified also that she and Van Liew had been having some troubles and that her sister, Mrs. Howard, had not told her where she had learned the story about Van Liew and Judy Monteiro. Mrs. Langston then called Van Liew and told him that she "had heard that he was seeing Judy Monteiro." He asked who had told her that. Mrs. Langston did not tell him. Indeed, she gave Van Liew no opportunity to explain, but told him that either she or he would have to move.

Van Liew, she said, had called her on the 28th (earlier than the call from Mrs. Howard) about his motorcycle. She had refused to lend him money to prevent the vehicle from being put in storage. He was upset about the prospect of losing his vehicle.

Patricia Gonsalves confirmed the account of her telephone talk with Mrs. Langston and told of a later telephone call to her from Van Liew, who was angry. He asked if she "had said anything about Judy and him." She told him that "she didn't know anything." Later she went to see him at the barroom. He was walking back and forth behind the bar, angry because Mrs. Langston was going to leave him. He asked her three times whether she had "said anything to" Mrs. Langston "about Judy." While she was there, he pulled a gun from a cabinet behind the bar and played with it. He then walked up to a back door and she "heard the shooting of the gun." The gun was replaced under the bar

counter by Van Liew.[3] Thereafter, Patricia went to Mrs. Langston's house, apparently at Van Liew's request, and later called him to say that Mrs. Langston "was not at home" but that "the furniture was there."[4]

Van Liew's counsel ably contends that Howard's statement to his wife just prior to October 28 constitutes inadmissible hearsay. See *Commonwealth* v. *DelValle,* 351 Mass. 489, 491-493 (1966); *Shepard* v. *United States,* 290 U.S. 96, 103-106 (1933). The trial judge admitted the statement properly, at least for the limited purpose of showing Howard's state of mind (as the trial judge at once instructed the jury). This would include, of course, the fact that Howard was then concerned about collecting some unspecified debt allegedly owed to him by Van Liew, and that to do so he was prepared to tell his own (Howard's) sister-in-law, Mrs. Langston, about having seen Van Liew and Judy Monteiro together. Howard's then existing state of mind could have relevance to Van Liew's motive, if it could be shown that Van Liew had knowledge of facts sufficient to create a reasonable suspicion that Howard was the person who had caused Mrs. Langston to learn that Van Liew and Judy had been seen together. See *Commonwealth* v. *Borodine,* 371 Mass. 1, 7-9 (1976), cert. denied, 429 U.S.

---

[3] On cross-examination Patricia testified that she had never seen Van Liew and Judy Monteiro together outside of the barroom where Van Liew worked and there only when Judy "was a customer."

[4] The judge, in a memorandum filed October 30, 1981 (long after the trial which was in April, 1981), reviewed the testimony summarized above. He then wrote that a "finding was made that this evidence, except for certain aspects excluded, was probative of a motive for the shooting. See *Commonwealth* v. *Borodine,* 371 Mass. 1, 7-9 (1976). The evidence was not offered for its truth and the jury was instructed to consider it for the limited purposes provided for in [the] *Borodine* [case]. A cautionary instruction was given . . . and the instruction was repeated at the conclusion of the trial. Although there was direct evidence that the defendant believed . . . [Howard] informed on him, the jury could have inferred such knowledge from the circumstances . . . . Evidence of motive need not be conclusive, but merely probative . . . [citing *Commonwealth* v. *St. Germain,* 381 Mass. 256 (1980)]. The probative value of this evidence outweighs the possible prejudice to the defendant and it was therefore admissible."

1049 (1977). See also *Commonwealth* v. *St. Germain,* 381 Mass. 256, 270-271 (1980).

Under the *DelValle* case, 351 Mass. at 491-492, Howard's statement to his wife was not admissible to prove the truth of the substantive facts therein contained. See Proposed Mass.R.Evid. 803(3) (July, 1980);[5] McCormick, Evidence §§ 294-296, especially at 696 (2d ed. 1972);[6] Liacos, Massachusetts Evidence 348-350 (5th ed. 1981). See also *Commonwealth* v. *Howard,* 8 Mass. App. Ct. 318, 322-323 (1979); 6 Wigmore, Evidence c. 58, especially §§ 1725-1730 (Chadbourn rev. 1976 & Supp. 1982). The prosecution, under the decided cases, could not rely upon Howard's statement to show that Howard in fact had spoken to Van Liew about seeing him with Judy Monteiro. From other facts in evidence, however, the jury could reasonably infer that Van Liew suspected Howard of informing Mrs. Langston. Van Liew knew from her telephone call to him on the twenty-eighth that someone had seen him with Judy. That Mrs. Langston was Mrs. Howard's sister had some tendency to point in Mrs. Howard's direction. Van Liew's call and talk with Patricia Gonsalves may well have satisfied him that Patricia was not the source of the report that had reached Mrs. Langston. His angry reply to Howard at the bar on the twenty-eighth, testified to by Earl Levy (when Howard told Van Liew that he had "better pay Mirna her five dollars"), might have reminded him that he owed Howard money (although there was no proof of this debt apart

---

[5] Proposed rule 803(3) reads, "The following are not excluded by the hearsay rule even though the declarant is available as a witness . . . . (3) Then existing mental, emotional, or physical condition. A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), *but not including a statement of memory* or belief *to prove the fact remembered* or believed unless it relates to the execution, revocation, identification, or terms of declarant's will" (emphasis supplied).

[6] It is pointed out in McCormick (at 703-704) that some "commentators are clearly in advance of the courts, although there is some evidence of an increased judicial willingness to admit evidence of memory . . . to prove the fact remembered . . . when this is closely related to declarations tending to prove intent or plan."

from Howard's statement) and thus have brought Howard within the range of suspicion. The jury could give some weight to the evidence of Van Liew's disturbed, erratic behavior and actions on the 28th before the shooting and to his statements to Anthony McNeil. Also the jury could infer from Van Liew's shooting of Howard at very close range, by pulling the trigger (as Crystal Walker testified), that the shooting was intentional.

Even if Howard's statement to his wife could not be employed to prove that Van Liew knew that Howard had seen him with Judy, we think that there was enough in properly admitted evidence to bring the present situation within the broad language of the *St. Germain* case, 381 Mass. at 271. There it was said, "'[I]f there is evidence of motive, that evidence is admissible' [citing the *Borodine* case, 371 Mass. at 8]. Determination of the weight of such evidence is for the jury, and evidence which merely suggests rather than 'clearly shows' a motive for the crime may still be ruled admissible. There is no requirement that evidence be conclusive in order to be admissible. As is the case with any evidence, resolution of the question whether evidence of motive is more probative than prejudicial lies within the sound discretion of the trial judge." Motive, of course (as the judge instructed), is not a necessary element of the crime of murder. See the *Borodine* case, at 8. In any event receiving evidence of motive which thus supplements the direct testimony of Crystal Walker (that Van Liew pulled the trigger) was not error. Compare *Commonwealth v. Brown*, 376 Mass. 156, 164-165 (1978).

In his charge, the trial judge dealt at some length with the conversation between Howard and his wife. Quotations of parts of these instructions appear in the margin.[7] In the cir-

---

[7] "I instructed you regarding that alleged conversation . . . offered for only one purpose . . . to show . . . the state of mind of . . . [Howard]. It is not to prove the truth of what is contained in that statement. It is only to show what his state of mind was at that point in time. It is for that limited purpose and for the limited purpose only of attempting to show a motive . . . . [T]hat conversation between . . . Howard and his wife was hearsay. Normally that would not be . . . [received in] evidence. It is permitted . . . for the very limited purpose that I have indicated, but you

cumstances, the jury was properly told of the extent to which they could rely on the conversation.[8]

2. The trial judge, subject to objection, charged as follows: "Now, during the course of my instructions the word intent will be referred to and has been referred to as a state of mind. The intention of a person cannot usually be *determined* from an undisclosed purpose, but it is to be *ascertained* from his acts and the *inference reasonably drawn* from what was and has been external and visible. [X] *A person is presumed to intend the natural and probable consequences of his own acts.* Intent is a decision of the mind . . . knowingly [to] do a specific act. The reasonable and natural consequences of a voluntary act of a person *may be found* to be intended." (Emphasis supplied.) Van Liew's counsel, because of the sentence following "[X]" in the preceding quotation (and in reliance on *DeJoinville* v. *Commonwealth,* 381 Mass. 246, 254 (1980), argues that this in-

---

cannot consider that unless you are satisfied that . . . Van Liew was aware of the circumstances that related to such motive. In determining that, you have to consider what the other witnesses testified to regarding — well, the witnesses who called him. [This presumably refers to Van Liew's telephone talks with Sheila Langston and Patricia Gonsalves.] If you believe that testimony, and if you do believe that it does indicate something to you, you can draw the conclusion that you are satisfied that he was aware of the circumstances surrounding this alleged motive. If you decide yes, then you may consider the conversation between . . . Howard and his wife and as to what state of mind he had and how that relates to whether or not there was an alleged motive as indicated. If you decide that he was not aware, then you are to put aside the conversation between . . . Howard and his wife and disregard it entirely."

[8] The portion of the charge set out in note 7, *supra,* was sufficient to offset the one reference by the prosecutor in argument to Howard's statement as establishing facts mentioned by Howard in his talk to his wife. The judge also immediately and forcefully at the close of the prosecutor's argument told the jury to disregard entirely "an alleged telephone call . . . from . . . [Howard] to his wife" on the twenty-eighth "indicating . . . how . . . Van Liew was acting at the bar" on the ground that there was no evidence in the case of such a telephone call. The judge at once had struck an earlier question by the prosecutor about that telephone call, which at the voir dire he had indicated that he was going to exclude. The judge's prompt and emphatic curative instruction was adequate to avoid error from the prosecutor's brief, improper reference to the telephone call. See *Commonwealth* v. *Brown,* 376 Mass. at 164-166.

struction "has a tendency to shift the burden onto [Van Liew] to provide evidence that he did not in fact act with malice." Since the *DeJoinville* case, "presumption" language, like that here criticized, often has been viewed in the context of the entire charge. See *Commonwealth* v. *Chasson*, 383 Mass. 183, 189-190 (1981), where (at 190) other portions of a charge were held to have avoided any reasonable possibility that the jury could have regarded the instruction "as shifting the burden of proof from the Commonwealth or as creating a constitutionally impermissible presumption." Even in the quotation above from the trial judge's charge, the emphasized language before and after the sentence following "[X]" is expressed essentially in terms of permissible inference. Elsewhere the charge forcefully stated the continuing burden on the Commonwealth to prove guilt beyond a reasonable doubt and the absence of any obligation on Van Liew to testify. The charge lays proper emphasis on the "presumption of innocence." There was an appropriate charge as to permissible inferences and as to the burden resting upon the Commonwealth to satisfy the jury beyond a reasonable doubt (as to the murder charge) that Howard's death "was not the result of accident or . . . from a sudden transport of passion or heat of blood" or from wanton or reckless conduct. In an additional instruction, the judge told the jury, "Malice may be *inferred* where there is knowledge of such circumstances that according to common experience there is a plain and strong likelihood that a grave personal injury will follow the doing of the act" (emphasis supplied). In the light of the whole charge, we perceive no possibility that the jury could have viewed the questioned language as imposing any burden-shifting presumption. If there was error, it was harmless. See *Commonwealth* v. *Drayton*, 386 Mass. 39, 53 (1982). See also *Commonwealth* v. *Estremera*, 383 Mass. 382, 394-396 (1981). Compare *Commonwealth* v. *Lee*, 383 Mass. 507, 511-512 (1981); *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 278 (1982).

*Judgments affirmed.*