COMMONWEALTH vs. DARCY LOWE.

Norfolk. October 3, 1983. — February 9, 1984.

Present: HENNESSEY, C.J., LIACOS, ABRAMS, NOLAN, & LYNCH, JJ.

*Homicide. Malice. Practice, Criminal, Instructions to jury. Evidence, State of mind, Presumptions and burden of proof.*

Statements made by a victim, outside the presence of the defendant charged with murdering her, to the effect that she had told the defendant that she did not intend to work for him as a prostitute and that she had decided, if she had to become a prostitute, it was her plan to keep the money herself and not give it to the defendant, were properly admitted in evidence at his trial for the limited purpose of showing the victim's state of mind, which could then have had relevance to the defendant's motive. [105-106]

Although hearsay testimony as to statements by a victim about the defendant charged with murdering her, including the statement that the defendant was a "pimp," related solely to the victim's memory of past events or belief and was, therefore, improperly admitted in evidence at his trial, even for the limited purpose of showing the victim's state of mind, the defendant was not prejudiced as the statements were cumulative of other evidence. [104-105, 106]

At a murder trial, evidence that the victim had worked as a prostitute shortly before her death and had not intended to give any of the money she earned to the defendant as he had expected; that her wallet was found, after her death, protruding from her purse, empty of money except for a $50 bill in a side pocket; that the defendant and the victim had argued in her apartment just before she was shot; and that the victim's body had a facial bruise which was not observed earlier in the evening when she left a party was sufficient for the jury to find, beyond a reasonable doubt, that the defendant shot the victim with malice aforethought. [107-108]

At the trial of a murder case, the judge did not err in refusing to give certain instructions pertaining to accident as requested by the defendant, where his charge to the jury, viewed in its entirety, emphasized that the Commonwealth had the burden of proving malice beyond a reasonable doubt and that malice could not be found unless the jury found the shooting to be intentional. [108-112]

INDICTMENT found and returned in the Superior Court Department on October 27, 1980.

The case was tried before *Roger J. Donahue, J.*

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*Willie J. Davis (Mary D. Gearin* with him) for the defendant.

*Charles J. Hely,* Assistant District Attorney, for the Commonwealth.

LIACOS, J.  The defendant was convicted by a jury on June 8, 1981, of murder in the second degree.  He was sentenced to life imprisonment at the Massachusetts Correctional Institution at Walpole.  On June 10, 1981, he moved for a required finding of not guilty after discharge of jury, or for a new trial.  The trial judge denied this motion after a hearing.  On appeal from this denial and from his conviction, the Appeals Court concluded that the judge's refusal, in the circumstances of the case, to give the instructions requested by the defendant on accident made a new trial necessary.  Accordingly, it ordered that the judgment be reversed and the verdict set aside.  *Commonwealth* v. *Lowe,* 15 Mass. App. Ct. 262 (1983).

Both parties petitioned this court for further appellate review.  We granted both petitions.  We conclude that the evidence which was presented at trial was sufficient to support a verdict of guilty of murder in the second degree, and that there is no basis on which to reverse the conviction.

We note first a procedural question raised by the Commonwealth about the defendant's motion for a required finding of not guilty after discharge of jury.[1]  At the close of the Commonwealth's evidence on June 5, 1981, the defendant moved for a required finding of not guilty.  The offense charged in the indictment was murder.  Under the indict-

---

[1] The defendant's written motion after the discharge of the jury was simply for a finding of not guilty or for a new trial.  At the hearing on the postconviction motion the defendant's counsel asked the judge also to consider entering a finding of guilty on so much of the indictment as charged manslaughter.

ment the defendant could have been found guilty of the included offenses of murder in the second degree and manslaughter. See *Commonwealth* v. *Burke,* 342 Mass. 144, 146 (1961). The defendant's motion was consequently a motion for a required finding of not guilty of any of the crimes of murder in the first degree, murder in the second degree, or manslaughter. In his argument before the judge in support of this motion, however, the defendant's counsel stated: "I will save the Court's time and submit that the motion as drafted should really be confined to the issue of murder in the first degree. I would think that as a matter of law, the jury could find manslaughter and possibly second-degree murder but the additional element of premeditation which is required for first-degree murder is lacking, I think, from the evidence." The rest of his argument and the Commonwealth's argument were confined to the issue of the sufficiency of the evidence to support a finding of murder in the first degree. The judge entered a finding of not guilty on so much of the indictment as charged murder in the first degree. The Commonwealth suggests that the above-quoted statement by the defendant's counsel precluded a posttrial motion as to the lesser included offenses.

The Commonwealth fails, however, to cite any authority or give any reason in support of its contention. The Commonwealth has not complied with the requirements of Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 919 (1975). Defense counsel's statement clearly withdrew from the judge's consideration the defendant's motion in so far as it related to the charges of murder in the second degree and manslaughter. Neither party has briefed the issue whether the withdrawal of this portion of the defendant's June 5 motion before it could be ruled on by the judge precluded the defendant from moving on June 10 for a required finding of not guilty as to murder in the second degree after discharge of the jury. The parties have briefed the substantive question of the sufficiency of the evidence to sustain the verdict of guilty of murder in the second degree. Thus, we shall assume, arguendo, that this issue is properly before us.

We summarize the evidence most favorable to the Commonwealth. Early on the morning of Saturday, October 25, 1980, the Quincy police, answering a call, found Mary Beth Graziano, age nineteen, lying dead on the floor of her bedroom at the front of her second floor Quincy apartment. She lay on her back with a single bullet hole in her chest. A single .22 caliber discharged cartridge casing was found on the bedroom rug, but the weapon which fired it was never discovered. There was no sign of a struggle. On the floor near Graziano was a woman's purse with a wallet protruding from it. In a side pocket of the wallet was a $50 bill folded in quarters. No other money was found in the wallet.

An autopsy revealed that a .22 caliber bullet had entered Graziano's left chest five centimeters to the left of her mid-breastbone line. Death was due to cardiovascular collapse and shock secondary to a gunshot wound of the great vessels of the heart. From the pattern of unburned gunpowder around the place where the bullet entered the body, it could be inferred that the gun was fired at a distance of between one and two feet away. In the opinion of the Commonwealth's firearms and ballistics expert, if a woman of Graziano's height were holding a .22 caliber handgun in her right hand one to two feet from her body, she could not discharge it in such a way that the bullet would enter her left chest at a thirty degree angle going from her left to her right side. Graziano's mother testified that her daughter was right-handed.[2] The Commonwealth's expert in forensic science concluded, from the amount of antimony and barium found on Graziano's left hand, that she either discharged a firearm with that hand or had that hand in close proximity to a discharging firearm.[3] The autopsy was performed on October

---

[2] This evidence apparently was offered to foreclose the argument (which was not raised by the defendant) that the victim committed suicide.

[3] Antimony and barium are two elements contained in the primer mixture of a firearm's cartridge. When the firearm is discharged, gases containing these elements escape from the barrel and from the areas of the cylinder, hammer, and trigger. The Commonwealth's expert in forensic chemistry testified that gunpowder primer residue would be found on a

25, 1980, the day Graziano died. On October 26, 1980, a State trooper who took fingerprints from Graziano's body observed a large black and blue area on the upper portion of her right cheek.

Shortly before Graziano's body was discovered, a neighbor in an adjoining apartment heard a commotion and a loud argument in Graziano's apartment. She could distinguish a male and a female voice in this argument but could not make out any words. She then heard a gunshot. After the gunshot the voices ceased. A neighbor who lived in the apartment directly beneath heard "a report" and within three minutes thereafter heard someone coming down the stairs with a great rush. He testified that he looked out the window and saw the defendant leap over three steps leading from the piazza of the apartment house and run down the walk to the street. There were two cars parked in front of the apartment house. The defendant ran between them around to the passenger side of one of them which was parked with its driver's side to the curb. As he did so, he looked over his shoulder at the upstairs window. He then ran around to the driver's side, got in the car, and drove off in a hurry.

Mary Beth Wasik, asleep in her bedroom at the back of the apartment she shared with Graziano, was awakened by a "big bang." She jumped out of bed and went to her closed bedroom door. Standing there, she heard Graziano say, "Oh, my God," in a very faint voice. She then ran out of her bedroom and out a back door located near her bedroom. As she ran out the back door, she heard Graziano say, "Oh, my God," faintly again. She ran down the stairs. She then ran to a neighbor's apartment and asked the neighbor to call the police.

Both Wasik and Natalie Morris, who was a bartender at the Narcissus, a Kenmore Square club frequented by the defendant and by Graziano, testified that the defendant and

_____

person's hand if she had recently fired a weapon or had been in close proximity to one being fired. He did not express an opinion as to which possibility was more likely to have caused the residue on Graziano's hand.

Graziano had been boy friend and girl friend, but that the relationship had become less close. Wasik testified that both she and Graziano had moved to Quincy from Vermont in July, 1980. Graziano met the defendant that same month and fell "head over heels for him." Wasik saw the defendant at the apartment five or six times between July and October, 1980, and the defendant stayed overnight with Graziano. About a month before Graziano died, the relationship changed. The defendant came over less often, Graziano did not talk about him much anymore, and she began seeing someone else. The last time Wasik saw the defendant was about a month before Graziano died.

The Thursday night prior to her death, Graziano went out with Wendy Brooks. They went first to the Narcissus. Wendy Brooks met the defendant briefly there. The defendant and Graziano had a conversation together for about one-half hour out of Brooks's hearing. Brooks, Morris, and Graziano then left the Narcissus together. The defendant did not accompany them, and Brooks did not see him again that night. Brooks last saw Graziano about 4 or 4:30 A.M., Friday morning, when Graziano left the after-hours place to which she and Brooks had gone. Graziano left with a man whom Brooks did not know.

About 12 P.M. Friday or 12:30 A.M. Saturday, Natalie Morris and Graziano went to a birthday party at the Cache, a club in Boston. Mary Beth Wasik joined them there later. Neither Morris nor Wasik noticed anything unusual about Graziano's face. Morris specifically stated that she did not remember seeing any marks or bruises on it. Both Morris and Wasik went home at about 2 A.M. when the club closed. When Morris last saw her, Graziano was standing outside the Cache club. Neither Morris nor Wasik saw the defendant that evening.

According to the testimony of the doorman at the Narcissus club, the defendant was at that club from about 11 P.M. Friday until shortly after 2 A.M. Saturday. About 2 A.M. Graziano, appearing distressed, knocked on the club's locked door and asked for the defendant. The doorman let her in.

She and the defendant left the club, a moment apart, about 2:10 A.M.

About 6:50 A.M., two Quincy police officers in a cruiser noticed Graziano and the defendant in an automobile. The defendant was driving. Graziano was sitting very close to the defendant, kissing him. The police followed the automobile for about six blocks until it turned onto a road which led to Hamden Circle. About 7:40 A.M. these officers received a call to investigate a shooting at Graziano's apartment at 110 Hamden Circle. There they found Graziano's body.

The defendant was arrested about 10 P.M. Saturday, October 25, 1980, as he was leaving an apartment in Framingham where he lived with one Patricia Marsh. When he came out of the apartment building he was carrying a box containing .22 caliber ammunition and a .22 caliber revolver.[4] After the defendant had been informed of his rights and was being driven to the Quincy police station, Lt. Neil MacDonald of the Quincy police asked him if he had a driver's license. The defendant replied, "No, and I probably won't need one for about twenty-five years." About 11 P.M., while the defendant was being fingerprinted, he twice said, "This could all have been avoided." About 8:30 the next morning, after one Quincy police officer told another that the police were going to conduct a skin-diving search for the murder weapon at Black's Creek in Quincy, the defendant said, "You won't find the gun there."

The judge admitted, over the defendant's objections, a great deal of testimony from witnesses as to statements Graziano had made to them in the months and days preceding her death. The judge instructed the jury, however, that they were to consider testimony as to statements Graziano had made only as evidence of her state of mind, not as proof of the truth of anything asserted in those statements. He additionally instructed them that Graziano's state of mind

---

[4] This revolver was not the weapon which fired the bullet that killed Graziano.

might be relevant in that it might tend to show a motive for the defendant to shoot her, but that it could only be relevant if the jury found from either direct or circumstantial evidence that her state of mind had been communicated to the defendant.

1. *The admissibility of Graziano's statements.* The evidence admitted included statements by Graziano to the witnesses that the defendant was a pimp; that he always carried a small gun because in his business he never knew what might happen; that he took Graziano to bars where he did business with "his ladies"; that Patricia Marsh, with whom the defendant lived, was his "head lady"; and that he had struck Graziano in August, 1980, and bruised her face in an argument over a comment she had made to Marsh. Wendy Brooks testified that on the Thursday night before Graziano died she had told Brooks that in August she had worked for herself on the side as a prostitute and also that the defendant "had set up tricks for her." Leslie Pratico, Graziano's best friend, testified that on October 10, 1980, Graziano told her that Patricia Marsh had set her up with some "tricks"; that she had "chickened out" of one "trick"; and that she had once worked as a prostitute out of a hotel in Cambridge.

It was error to admit this testimony as to statements Graziano had made, even for the limited purpose for which the judge admitted them. An extrajudicial statement of a declarant is not ordinarily admissible if it is a statement of memory or belief to prove the fact remembered or believed. See *Shepard* v. *United States*, 290 U.S. 96 (1933); Proposed Mass. R. Evid. 803 (3) and Fed. R. Evid. 803 (3); P.J. Liacos, Massachusetts Evidence 348-350 (5th ed. 1981). These statements of Graziano were statements of memory of past events or belief. Although the judge admitted them only as evidence of Graziano's state of mind, these statements did not fall within the state of mind exception to the hearsay rule. In admitting Graziano's statements, the judge relied on *Commonwealth* v. *Borodine*, 371 Mass. 1 (1976), cert. denied, 429 U.S. 1049 (1977). The statements whose admission we upheld in that case indicated that the victim had

abandoned her plans to marry the defendant and intended instead to terminate their relationship. The statements admitted in *Borodine* were not statements of memory or belief to prove the fact remembered or believed. Similarly, the statements which we held to have been admitted properly in *Commonwealth* v. *Weichell,* 390 Mass. 62, 64, 73-74 (1983), were statements of intent, or threats, appropriately characterized as within the state of mind exception to the hearsay rule. Cf. *Commonwealth* v. *St. Germain,* 381 Mass. 256, 270 & n.25 (1980). The statements of Graziano which related solely to past events, memory, or belief were inadmissible.[5]

Other extrajudicial statements by Graziano were admitted properly. Leslie Pratico testified that on October 10 Graziano told her that she and the defendant had talked about prostitution, but that she told him that she would not prostitute herself; Graziano said to Pratico at the same time that she needed money for rent and for school and that if she had to work as a prostitute she intended to keep the money herself and not give it to the defendant. On the Wednesday before her death Graziano told Pratico, over the telephone, that she had made $588 by working a convention and that

---

[5] The defendant argues only that the statements by Graziano that the defendant was a pimp should not have been admitted. His argument is on two grounds: that such statements are evidence of his prior criminal conduct, and that they are hearsay. Only the second of these grounds is a valid one, since the evidence that the defendant was a pimp was relevant to the establishment of a motive on his part to murder Graziano. See *Commonwealth* v. *Young,* 382 Mass. 448, 462-463 (1981).

The Commonwealth used Morris's statement to the police that she knew the defendant to be a pimp to impeach her statement at trial that she did not know for a fact what the defendant did for a living. Since the statement to the police was apparently an assertion that Morris knew of her own personal knowledge that the defendant was a pimp, it was not a hearsay statement and was inconsistent with her testimony at trial. It was therefore admissible for impeachment purposes, a proper foundation having been made. See G. L. c. 233, § 23. Wasik's testimony that she asked Graziano whether the defendant was a pimp, by the nature of its form as a question, was not offered to prove the truth of any matter. The question might have been excluded, however, as calling for incompetent hearsay evidence.

she planned to make about that much money the next day by going back to it. Pratico testified that Graziano was happy about the money she was making and that the defendant's name was not mentioned in this conversation. Except for the part that Graziano had already worked a convention and made $588, which was a statement of memory as to past facts, these statements by Graziano were admissible as statements of intent or plan. *Commonwealth* v. *Weichell, supra. Commonwealth* v. *Borodine, supra.* See *Commonwealth* v. *Trefethen,* 157 Mass. 180 (1892); Proposed Mass. R. Evid. 803 (3), and Fed. R. Evid. 803 (3).

The latter statements, being properly treated as admissible under the state of mind exception to the hearsay rule, were probative as to the victim Graziano's state of mind. Such statements were relevant as to motive, however, only if it could be shown that the defendant was aware of that state of mind prior to the homicide. *Commonwealth* v. *Van Liew,* 14 Mass. App. Ct. 662, 666-667 (1982). The judge cautioned the jury properly as to these factors when the evidence was admitted, and he charged the jury properly as to the limited use to which the jury could put this evidence. He emphasized that the jury could not consider this evidence unless they found, by direct or circumstantial evidence, that the defendant was aware of that state of mind. "Determination of the weight of such evidence is for the jury, and evidence which merely suggests rather than 'clearly shows' a motive for the crime may still be ruled admissible." *Id.* at 668, quoting *Commonwealth* v. *St. Germain, supra* at 271. There was no error in this ruling.

As to the portions of hearsay improperly admitted, the same limiting instructions were given. Although some of Graziano's statements were improperly admitted, they were cumulative in nature, and we see no reversible error in their admission. *Commonwealth* v. *Bongarzone,* 390 Mass. 326, 342 (1983). See *Commonwealth* v. *DeWolfe,* 389 Mass. 120, 124 n.3 (1983); *Commonwealth* v. *Williams,* 378 Mass. 217, 229-231 (1979).

2. *Sufficiency of evidence of malice aforethought.* In reviewing the denial of a motion for a required finding of not guilty in a criminal case, the standard which we apply is whether the evidence, read in a light most favorable to the Commonwealth, was sufficient to satisfy a rational trier of fact of each element of the crime beyond a reasonable doubt. *Commonwealth* v. *Amado,* 387 Mass. 179, 186 (1982). *Commonwealth* v. *Latimore,* 378 Mass. 671, 676-678 (1979). From Graziano's statement that she intended to keep the money herself and not give it to the defendant if she had to work as a prostitute, in combination with her statement on the Wednesday before she died that she planned to work a convention the next day, the jury could infer that she worked as a prostitute on the Thursday before she died and that she did not give any of the proceeds to the defendant. They could have inferred also that the defendant had wanted, or for some reason regarded as his due, any money she made from prostitution. From the fact that Graziano's wallet was found protruding from her purse, empty of any money but a $50 bill in a side pocket, the jury could have inferred that the defendant had found out that Graziano had worked as a prostitute, that the argument they had just before she was shot was about the money she had made as a prostitute, and that the defendant took what money he found in her wallet. The jury could have concluded that the defendant had a motive to murder. From the testimony that there was an argument in the apartment before the shot was fired, that there was no bruise on Graziano's face when she was at the birthday party and that there was a bruise on the cheek of her corpse, they could have inferred that the defendant hit her some time after she came to find him at the Narcissus club about 2 A.M. This evidence was sufficient for the jury to have found, beyond a reasonable doubt, that the defendant shot Graziano with malice aforethought. Malice aforethought includes any unexcused intent to kill, to do grievous bodily harm, or to do an act creating a plain and strong likelihood that death or grievous harm will follow. *Commonwealth*

v. *Huot,* 380 Mass. 403, 408 (1980). *Commonwealth* v. *Mangum,* 357 Mass. 76, 85 (1970). It may be inferred from the intentional use of a deadly weapon. *Commonwealth* v. *Campbell,* 375 Mass. 308, 312 (1978). There was evidence from which it could be inferred beyond a reasonable doubt that the defendant intentionally shot Graziano or that he intentionally performed an act creating a plain and strong likelihood that she would be killed. It could be inferred from the angle of the bullet's path, and the fact that she was right-handed, that Graziano did not shoot herself.[6] There was sufficient evidence to warrant the jury's verdict.[7]

3. *Sufficiency of the charge: accident.* Patricia Marsh, with whom the defendant lived, testified that on the day that Graziano died, the defendant told Marsh that "he was out and that he had run into [Graziano] and there was an accident." The evidence thus fairly raised the possibility of accident, and the defendant was entitled, if he so requested, to a jury instruction that the Commonwealth bore the burden of proving beyond a reasonable doubt that the shooting was not accidental. *Commonwealth* v. *Zezima,* 387 Mass. 748, 756-757 (1982). *Lannon* v. *Commonwealth,* 379 Mass. 786, 790 (1980). *Commonwealth* v. *Lowe,* 15 Mass.

---

[6] Although the evidence of consciousness of guilt — that the defendant did not call for help after Graziano was shot, that he ran away taking the death weapon with him and hid it, and that he made various incriminating statements to the police — is not enough by itself to warrant a finding of guilt, this evidence could be considered by the jury along with the other evidence in the case. See, e.g., *Commonwealth* v. *Best,* 381 Mass. 472, 483 (1980); *Commonwealth* v. *Haney,* 358 Mass. 304, 306 (1970). Such evidence, while relevant to the issue whether a criminal homicide was committed, is not evidence of malice aforethought. Cf. *Commonwealth* v. *Blaikie,* 375 Mass. 601, 605-606 (1978). Although the defendant did not raise this question, we do not rely on the evidence of consciousness of guilt in our analysis. There was sufficient other evidence to warrant a finding of malice aforethought.

[7] We note that the judge also charged the jury that they could find the defendant guilty of the lesser included offenses of voluntary and involuntary manslaughter. The defendant raised no objection to this portion of the charge.

App. Ct. at 265. The defendant did not request such an instruction but did request two other instructions pertaining to accident,[8] which the judge refused to give. The defendant made an adequate objection to this refusal. *Commonwealth* v. *Martin*, 369 Mass. 640, 645-646 (1976). The judge, however, was not required to instruct the jury in the terms urged by the defendant, so long as he covered adequately the substance of the requested instructions. *Commonwealth* v. *DeChristoforo*, 360 Mass. 531, 539 (1971). See *Commonwealth* v. *Jones*, 375 Mass. 349, 359 (1978). The Commonwealth argues that, because the judge repeatedly instructed the jury that the Commonwealth had the burden of proving beyond a reasonable doubt that the shooting was intentional, his failure to instruct on accident was not reversible error. The Commonwealth argues that the jury's rejection of a finding of involuntary manslaughter in favor of a finding of malice aforethought shows that they could not have had a reasonable doubt about the killing being an accident. The defendant relies on *Commonwealth* v. *Zezima*, *supra*, *Commonwealth* v. *Robinson*, 382 Mass. 189 (1981), and *Lannon* v. *Commonwealth*, *supra*, in claiming error in the judge's failure to instruct the jury that the Commonwealth had the burden of proof that the homicide was not the result of an accident.[9] We conclude that these cases give no strength to the defendant's claims.

In *Commonwealth* v. *Zezima*, *supra* at 756, we stated: "A defendant is also entitled, as a matter of due process, to have the judge instruct the jury that the Commonwealth

---

[8] The instructions which the defendant requested were as follows:

"An act is 'knowingly' done if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

"When a person commits an act through misfortune or by accident under circumstances that show no evil design, intention or culpable negligence, he does not thereby commit a crime."

[9] *Robinson* and *Lannon* were decided before the trial of this case. The Appeals Court based its decision primarily on these cases. 15 Mass. App. Ct. at 264. *Zezima*, decided after the trial, adds no new dimension to the principle involved. In *Zezima*, unlike here, the defendant testified at trial that the death was accidental. We do not rely on this distinction.

has the burden of proving that a shooting was not acciden-
tal, when that issue is fairly raised. *Commonwealth* v. *Zac-
cagnini*, 383 Mass. 615, 616 (1981). *Commonwealth* v.
*Robinson*, 382 Mass. 189, 203 (1981). *Lannon* v. *Common-
wealth*, 379 Mass. 786, 790 (1980)."

In *Zezima*, however, the judge used language indicating
that the jury had "to find" the defendant's conduct to be
unintentional. We concluded that "[s]ince [the] instruction
on the Commonwealth's general burden of proof was lim-
ited to one brief portion of the charge, the judge's failure to
inform the jury that the Commonwealth bore the burden of
disproving accident, his use of 'finding' language, and most
significantly, his failure to establish the 'nexus' between
proof of malice and disproof of accident, deprived the de-
fendant of due process. The errors in the instructions on
malice and the failure to instruct on accident could have led
the jury to shift the burden of proof from the Common-
wealth to the defendant." *Zezima, supra* at 757.

Similarly, in *Commonwealth* v. *Robinson, supra,* involv-
ing a claimed defense of duress, the defendant claimed there
was no explicit instruction that the Commonwealth bore the
burden of negating duress beyond a reasonable doubt. We
stated that the "'critical' part of a constitutionally sufficient
charge [is] that a 'nexus' be established between the
elements of the crime charged, and the absence of the par-
ticular defense." *Id.* at 207. Thus, since the judge ade-
quately charged the jury in that case as to the burden of the
Commonwealth to establish the free will of the defendant to
commit the crime alleged, without shifting the burden of
proof, we concluded there was no error. "[A]ny question-
able remarks were overcome by the charge as a whole which
was sufficient to inform the jury about their true duty." *Id.*
at 208. Of similar import is our discussion in *Lannon* v.
*Commonwealth, supra.* Thus, as we view *Zezima, Robin-
son,* and *Lannon,* the vice they address is the use of burden
shifting language. These cases also stand for the time-hon-
ored proposition that, if a charge, viewed as a whole, ade-
quately informs a jury of the burden of the Commonwealth

to establish each element of the crime, including the disproof of a so called affirmative defense (e.g., self-defense, insanity, alibi, accident), there is no error. *Commonwealth v. Robinson, supra* at 203. See *Commonwealth v. Fitzgerald*, 380 Mass. 840 (1980).

The judge's charge in this case emphasized several times that the Commonwealth had the burden of proof to establish malice aforethought in order to find the defendant guilty of murder in the second degree. In further refining this instruction, the judge emphasized throughout the charge that malice could not be found unless the jury found the shooting to be intentional.[10] Considering the charge in its

---

[10] For example, the judge stated: "Again, a very simple definition of murder: Any *intentional* killing of a human being without legal justification or excuse, with no extenuating circumstances sufficient in law to reduce the crime to manslaughter, is malicious within the meaning of that expression and is murder and not manslaughter. . . . Again, the killing must be *intentional* and you must keep in mind my previous definition of specific criminal intent. . . . If a man *intentionally* and without legal justification, excuse or extenuation uses upon the body of another a force, for example, a bullet from a revolver, that as used will probably do grievous bodily harm to that other and will create a plain and strong likelihood that that other will die as a result, a jury may draw a permissible inference that that act is malicious within the meaning of the law even though the doer of that act was indifferent as to whether death would result or wished and hoped that death would not result. . . . And as I have said, malice may be proved from the *intentional* use of a deadly weapon such as a gun." (Emphasis supplied.)

As to involuntary manslaughter, the judge stated: "Involuntary manslaughter is an unlawful homicide *unintentionally* caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct" (emphasis supplied).

In response to questions from the jury, the judge later stated: "You will remember earlier this afternoon I told you that murder was an *intentional* killing . . . . A homicide or murder is an unlawful killing, an *intentional* killing. It is often said to be a killing with malice aforethought, an unlawful killing, a killing with malice aforethought. . . . So, again, murder is the killing of a human being without legal justification or excuse and without such extenuation as may reduce the crime to manslaughter. . . . So, again, murder is a killing with malice aforethought. . . . If the killing was *intentional* though the act followed the thought immediately, without time for deliberation or reflection, and there was no legal justification, excuse or extenuation, the killing was with malice aforethought within the meaning of that very technical and

entirety, *Commonwealth* v. *Fluker*, 377 Mass. 123, 129-130 (1979), we conclude that "[t]his is a case where the jury charge 'clearly placed the burden of proving malice beyond a reasonable doubt on the Commonwealth and contained other discussion which, although not referring to the burden of proof as to [accident], adequately defined [that factor] and established [it] as negating a finding of malice.'" *Reddick* v. *Commonwealth*, 381 Mass. 398, 405 (1980), quoting *Commonwealth* v. *Stokes*, 374 Mass. 583, 591 (1978). There was no error.[11]

*Judgment affirmed.*[12]

somewhat misleading expression of law. . . . Any *intentional* killing of a human being without legal justification or excuse, with no extenuating circumstances sufficient in law to reduce the crime to manslaughter, is malicious within the meaning of that expression and is murder and not manslaughter. . . . And as I said this morning, if you can draw two inferences from the same evidence, you cannot draw the inference favorable to the government's case because, as I said, the element of reasonable doubt has entered the picture. Suppose, for instance, a deadly weapon is used and someone is killed and a person is charged with a killing. *If the jury from all the evidence can draw two inferences, one inference that the killing was intentional and the other inference that it was not, the jury cannot then draw the inference that it was intentional because there are two different conclusions you could reach and where the defendant's guilt or innocence hangs upon a conclusion that is drawn from circumstances, the jury must be convinced to a point beyond reasonable doubt that there is only one conclusion and not two conclusions.* . . . If one person kills another, even with a deadly weapon such as a gun, the jury can draw the inference that there was no intent to kill. This is voluntary manslaughter. . . . *Involuntary manslaughter is an unlawful homicide unintentionally* caused by an act which constitutes such a disregard of probable harmful consequences to another as to amount to wanton or reckless conduct." (Emphasis supplied.)

[11] The case of *Commonwealth* v. *Martin*, 369 Mass. 640, 644 (1976), on which the Appeals Court relied, 15 Mass. App. Ct. at 266, is inapposite. In *Martin*, the issue was whether the defendant was entitled to use force to protect a third person, and whether there was justification for various alleged assaults. There, although the evidence raised the issue, the judge declined to charge on the privilege to use force to defend another, and the charge given nowhere covered the point.

[12] The defendant has claimed error arising from alleged improprieties in the prosecutor's closing argument. We see no need to discuss the point beyond stating that we have reviewed the transcript and agree with the conclusion of the Appeals Court to the extent it concluded no reversible error to be shown on this ground. 15 Mass. App. Ct. at 266-267.