COMMONWEALTH *vs.* ETHEL ROTONDO SHAPIRO.

Suffolk.   September 16, 1980. — November 5, 1980.

Present: BROWN, DREBEN, & KASS, JJ.

*Conspiracy.   Joint Enterprise.*

Evidence that a defendant knew of the existence of a counterfeiting opera-
   tion in which her husband was involved with others and that she knew
   of the presence of counterfeit money in her house was insufficient to
   warrant a finding that she had conspired to possess the counterfeit bills
   with the intent to utter and pass them where there was no evidence
   that she had entered into an agreement with the conspirators or had
   done any act in furtherance of the conspiracy.  [681-684]

INDICTMENT found and returned in the Superior Court on
September 7, 1977.

The case was tried before *Simons, J.*

*Patricia A. O'Neill* for the defendant.

*M. Catherine Huddleson,* Legal Assistant to the District
Attorney (*Sharon D. Meyers,* Special Assistant District At-
torney, with her) for the Commonwealth.

KASS, J.  Ethel Rotondo Shapiro was convicted by a jury
of conspiring with six other persons to possess and to utter,
pass and tender in payment counterfeit Federal Reserve
Bank notes.[1]

Among the points raised on appeal is the denial of the de-
fendant's motion for a directed verdict.  In order to apply
the familiar principles which determine that question we
summarize the evidence introduced by the Commonwealth
up to the time it rested, considered in the light most favora-

---

[1] With the defendant's consent, the indictment to utter counterfeit bills was
placed on file, and this appeal is only from the conviction under the indict-
ment to possess the counterfeit bills with the intent to utter and pass them.

ble to the government. *Commonwealth* v. *Walter, ante*
255-257 (1980), and cases cited. To withstand a motion for
a directed verdict it is sufficient if the possible inferences
from the evidence are such as will satisfy "a rational trier of
fact . . . beyond a reasonable doubt" that the elements of
the crime charged have been established. *Commonwealth*
v. *Latimore*, 378 Mass. 671, 677-678 (1979).

Beginning around November, 1976, and continuing
through March, 1977, James Shapiro (the defendant's hus-
band), Joseph Napolitano, Orlando Napolitano, John Jan-
noni, and Leland Atherton met to plan and follow through
the manufacture and distribution of ten million dollars in
counterfeit currency. Paper of the proper kind turned out
hard to come by and it was not until April, 1977, that
Atherton, James Shapiro and Joseph Napolitano succeeded
in Portland, Maine, in obtaining paper acceptable to their
printer.[2] On May 13, 1977, Atherton became an informer
for the government and thereafter feigned participation in
the enterprise.

By July 8, 1977, James Shapiro had received over
$3,000,000 in bogus one-hundred dollar bills from the
printers but a cloud of disappointment hovered over the
counterfeiters: many of the bills were not of good quality.
Shapiro invited Atherton to come to his house to inspect
them, and Atherton did so. The defendant Ethel and some
of her children were in the Shapiro house at that time.
James removed two boxes of bills from a cubbyhole behind a
dresser in his bedroom, and he and Atherton, donning rub-
ber gloves, made up a package of notes with a face amount
of approximately $50,000. While so engaged they were
joined by one Jackie Soule, who upon examining the bills

---

[2] Although acceptable, it was not up to the mark. One of the respects in
which the bills manufactured were identifiably fake was that there were
no red and blue fibers embedded in the paper stock. Also the paper used
by the counterfeiters, although described as of "high bond content," was
distinguishable to the government's expert, a special agent of the United
States Secret Service, from the special paper used for genuine currency.

shared Shapiro's doubt as to how good they were. "Franklin," he said, "looked embarrassed."

Craftsmanship proved to be one of the counterfeiters' lesser problems. Later that night, police, who had been keeping the operation under surveillance for months and, of course, were hearing from Atherton, arrived at the Shapiro residence with a search warrant and went unerringly to the cubbyhole and the boxes of bills. They also found a box of rubber gloves and a large box of one-hundred dollar bill scraps in a bedroom closet. Ethel was present during the search. James Shapiro, who was also at home, was arrested.[3]

Much of the remainder of the Commonwealth's evidence against the defendant came from transcriptions of wire-tapped telephone conversations between her and Atherton which occurred after the seizure of the counterfeit money by the government and the arrest of the principal conspirators. These conversations warranted the jury in finding that Ethel knew more about the counterfeiting operation than she was willing to divulge to the police. Indeed, she described herself to Atherton as "playing dummy." Allusions to "that thing in Maine" suggested the defendant knew about the shopping trip for paper. After her husband's arrest she spoke of expecting Soule to come to her house to relay "information." That meeting never took place. In these telephone conversations with Atherton, Ethel expressed apprehension about the other conspirators thinking that she knew "anything too much, cause they'll do something to me." She talked to Atherton about disposing of "those two things that were in the blue bag," from which one can fairly infer that she suppressed potentially incriminating evidence.

Several days after the police seizure of the counterfeit money the defendant called Atherton to say she had found some more counterfeit money in her house. Atherton of-

---

[3] James Shapiro and Orlando Napolitano entered pleas of guilty when they came to trial.

fered to take the fake currency, which consisted of 407 one-hundred dollar bills, and the defendant turned them over to him.

The defendant knew the names of four people involved in the conspiracy and knew what was in the boxes in her bedroom from the time they were put there two days before James Shapiro's arrest. There were also conversations in which the defendant asked Atherton to reassure Joseph Napolitano that her husband wouldn't tell the police anything, and she also asked that word be relayed that James Shapiro's lawyer, who was a friend of Joseph Napolitano, "isn't doing nothing for Jimmy" and that she needed some money for herself and her children.

We have had occasion recently in *Commonwealth* v. *Cook, ante* 668, 670-671 (1980), to restate the essential elements of conspiracy. For purposes of this opinion it is necessary to keep in mind that substantial reliance on circumstantial evidence in conspiracy cases is the norm, *Commonwealth* v. *Nelson*, 370 Mass. 192, 200 (1976), and that the inferences of guilt need not be "inescapable or necessary." *Id.* at 201. See also *Commonwealth* v. *Dellinger, ante* 549, 556-557 (1980). However, the evidence "must be such as to produce a moral certainty of guilt, and to exclude any other reasonable hypothesis." *Commonwealth* v. *O'Brien*, 305 Mass. 393, 400 (1940). Probability is not enough; "seriously suspicious" evidence is not enough. *Commonwealth* v. *David*, 335 Mass. 686, 696 (1957). See *Commonwealth* v. *O'Rourke*, 311 Mass. 213, 220 (1942); *Commonwealth* v. *Fancy*, 349 Mass. 196, 200 (1965). If "the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof." *Commonwealth* v. *Nelson*, 370 Mass. at 206, and cases cited.

From the evidence we have recited a jury could, without difficulty, conclude that the defendant Ethel Shapiro was conversant with the existence of the counterfeiting operation and the presence of the money in her house. Knowledge alone, however, is not enough to make a person a

member of a conspiracy; that person must "actively partici-
pate therein and must do something in furtherance of it be-
fore he is liable as a member." *Commonwealth* v. *Beal*, 314
Mass. 210, 222 (1943). Even when knowledge that a crime
is to be committed is followed, as here, by concealment of
the crime, the knowing person does not become a principal
to the crime. *Commonwealth* v. *Perry*, 357 Mass. 149, 151
(1970). The defendant has not been charged with being an
accessory after the fact. There is a distinction between acts
in furtherance of a conspiracy and acts of concealment done
for the purposes of covering it up. *Grunewald* v. *United
States*, 353 U.S. 391, 401-402 (1957).

At the core of any conspiracy, in any event, is an agree-
ment to further its object, *Commonwealth* v. *Cook, supra*
at 671, and cases and authorities therein cited, and it is this
element which we cannot find in the Commonwealth's evi-
dence. To the extent that the wiretapped conversations
with Atherton reveal that the defendant Ethel knew the
names of some of the conspirators, they also show she knew
only what her husband told her. Of the conspirators whose
names she knew, she said, "I don't really know them." No
evidence placed the defendant at any of the sessions at
which the counterfeiting operation was planned and at
which steps were taken to further it. Nor, in wiretapped
conversations between Atherton and some of the con-
spirators, did they refer to the defendant as a collaborator;
rather, because of her assiduous demands for money and
help for her incarcerated husband, they referred to her as "a
. . . nut" and "a . . . mental case."

To the extent that one might infer acquiescence in the
conspiracy from Ethel's conversations with Atherton and
the fact that for two days she knew that the counterfeit
money was hidden in her house, it is not the type of "affirm-
ative acquiescence to the object of a conspiracy" as may
amount to acting in furtherance of it. See *Commonwealth*
v. *Beneficial Fin. Co.*, 360 Mass. 188, 250 (1971), *cert.
denied*, 407 U.S. 914, and sub nom. *Farrell* v. *Massachu-
setts*, 407 U.S. 910 (1972). On its facts, the case at bar dif-

fers from examples of affirmative acquiescence cited to us by the Commonwealth, e.g.: *Commonwealth* v. *Beal*, 314 Mass. at 223 (partner in architectural firm acquiesced in payment of bribes where cost was charged to his partnership account); *Commonwealth* v. *Kelley*, 359 Mass. 77, 91 (1971) (defendant accepted money and sold stock as required of him by the mechanics of the conspiracy); *Commonwealth* v. *Beneficial Fin. Co.*, 360 Mass. at 250 (defendant's presence at several planning sessions to bribe a public official was in his capacity as an officer of one of a group of companies contributing to the bribe); and *Commonwealth* v. *Beckett*, 373 Mass. 329, 341-343 (1977) (wife acted in support of husband to obtain welfare payments from the Commonwealth by fraud, and was an indispensable party to making the fraud work).

Much of what is offered as the strongest evidence against the defendant is susceptible to alternative inferences: her unwillingness to cooperate with the police leads equally to the conclusion that she was protecting her husband as to the conclusion that she was masking her role in the conspiracy; her demands for money lead as easily, indeed rather more plausibly, to the conclusion that she needed, and felt entitled to, help to get her husband out of jail as it does to the conclusion that she felt entitled to payment for her participation in the abortive counterfeiting venture; her fear of the other conspirators equally supports the inference that she felt threatened by her passively acquired knowledge of the conspiracy, as the inference that she was part of the conspiracy; her delivery of the 407 false one hundred dollar bills to Atherton leads as easily to the conclusion that she wanted potentially troublesome evidence out of her house as to the conclusion that the transfer was made in furtherance of the conspiracy; and her statement to Atherton that "I've never done anything like this in my life," as easily supports an inference that she was concerned about concealing evidence as that she had participated in the conspiracy.[4]

---

[4] The wiretap transcriptions of the defendant's telephone conversations disclose a tough talking person who is something less than a guardian of

We are of the opinion that, viewed most favorably to the Commonwealth, its evidence tended equally to support either of a series of alternative inconsistent propositions. In such circumstances none can be said to have been established, and a verdict in favor of the party having the burden of proof is unwarranted. *Commonwealth* v. *O'Brien,* 305 Mass. at 400. *Commonwealth* v. *Fancy,* 349 Mass. at 200, and cases cited. Compare *Commonwealth* v. *Rhoades,* 379 Mass. 810, 817 (1980). While the line separating knowledge of the fact that a conspiracy exists from participation in the conspiracy "is often vague and uncertain" and it is then within the province of the jury to determine if the line has been crossed, *Commonwealth* v. *Beneficial Fin. Co.,* 360 Mass. at 250, on the facts of the instant case, we think that a rational trier of fact could not conclude beyond a reasonable doubt that the defendant had entered into an agreement with the counterfeiters. See *Commonwealth* v. *Latimore,* 378 Mass. 671, 676 (1979); *Commonwealth* v. *Deagle, ante* 563, 567-568 (1980).

Disposing of this issue as we do, we do not reach the other questions presented by the defendant. The judgment is reversed, the verdict is set aside, and judgment is to be entered for the defendant.

*So ordered.*

---

law and order. Granting that she spoke with the diction of a criminal, the law does not have the facility of Shaw's Professor Higgins to categorize people by the way they speak.