## COMMONWEALTH vs. JAMES THEMELIS.

Middlesex.    September 9, 1986. — October 8, 1986.

Present: GREANEY, C.J., CUTTER, & KASS, JJ.

*Conspiracy. Accessory and Principal. Evidence*, Hearsay. *Practice, Criminal*, Required finding, Disclosure of evidence, Mistrial. *Error*, Harmless.

Discussion of the principle that a defendant cannot be found guilty of conspiracy if the only person with whom the defendant has conspired has simply feigned agreement to the plan. [757-759]

At the trial of a defendant charged with conspiracy to commit murder, and with being an accessory before the fact to an armed breaking and entering in the nighttime with intent to commit a felony, testimony by the coconspirator that he had simply feigned agreement to the plan, never intending to commit the murder, did not entitle the defendant to required findings of not guilty, where there was also ample evidence that the coconspirator had in fact intended to combine with the defendant to commit the murder and that at the time the armed break occurred the coconspirator had had an intent to kill. [759-761]

A defendant charged with conspiracy to commit murder was not entitled to a mistrial by reason of the prosecutor's failure to disclose to the defense that, after the coconspirator's testimony before the grand jury, he changed his account of the events in question and advised the prosecutor that he had no intention of killing the intended victim while he was in the victim's house, where at the time this information came to light defense counsel had not made an opening statement and had not committed himself to any theory inconsistent with the defense ultimately put forward, where defense counsel did not seek a continuance when he learned at trial of the coconspirator's change in his testimony, where the coconspirator's principal disclosure at trial, that he never intended to kill the victim, came as a surprise to both sides, and where defense counsel effectively cross-examined the coconspirator. [761-763]

INDICTMENTS found and returned in the Superior Court Department on December 29, 1982.

The cases were tried before *John T. Ronan*, J.

*Barry M. Haight* (*Sandra L. Hautanen* with him) for the defendant.

*Fredric Lee Ellis*, Assistant District Attorney, for the Commonwealth.

GREANEY, C.J. After a seven-day trial before a jury in the Superior Court, the defendant was convicted of conspiracy to commit murder and of being an accessory before the fact to an armed breaking and entering in the nighttime with intent to commit a felony. He has appealed, arguing that the trial judge erred (1) in denying his motions for required findings of not guilty on both charges, (2) in failing to declare a mistrial due to the prosecutor's alleged failure to provide exculpatory information, and (3) in admitting a statement in evidence for substantive purposes as an exception to the hearsay rule.

The evidence most favorable to the Commonwealth permitted the jury to find the following facts. On June 5, 1982, the defendant approached James Primeau and offered him a job. According to the defendant, the job would pay well and would allow Primeau to repay $500 owed the defendant from a marijuana deal. When explaining the job's nature, the defendant indicated to Primeau that "somebody had to be murdered." Primeau agreed to do it.

On June 13, 1982, the defendant and Primeau met again. The defendant asked Primeau if he was "sure" about the job and Primeau responded that he was. The defendant then drove Primeau to look at the intended victim's home and gave him a detailed diagram of the floor plan of the house. The plan included marks indicating where valuables could be found. The defendant suggested that Primeau enter the house while the intended victim was out and wait for her to return. The defendant also gave Primeau keys to the house, a picture of the intended victim,[1] and a copy of her daily schedule. The defendant told Primeau to carry out the murder between June 21 and June 29.

---

[1] Primeau was never told the intended victim's name by the defendant, but he knew her as the owner of a bar in Lowell.

On June 14, 1982, Primeau bought two buck knives and began to practice throwing them at targets. A few days later, Primeau recruited a friend of his, Christopher Gale, to join him in what he described as a burglary. He did not mention the murder agreement. On June 21 Primeau met the defendant and asked for another $100 because he needed a "piece."[2] (At their meetings, the defendant paid Primeau a total of $2,600, of which Primeau returned $500 to settle his drug debt.) On June 28, Primeau met with Gale and indicated that they would break into the house on June 29 and steal some money and jewelry. Primeau showed Gale the diagram of the house and the photograph of the intended victim and stated, "This is the lady here I got to take care of."

Early on the afternoon of June 29, Primeau and Gale went to the intended victim's home and cut cable television wires next to the house, believing that they were telephone lines. They then left. Later in the evening of June 29, Primeau and Gale returned. Primeau had either lost or thrown away the keys, so he entered the house by breaking a cellar window with a knife. Primeau and Gale then spent some time in the cellar, using a set of weights and some punching bags they found there. They also drank beer from a refrigerator in the basement. Some time after midnight, a dog started barking upstairs, and Primeau heard a woman's voice trying to quiet the dog. Primeau then began to tap on the cellar door, which was bolted from the other side, with his knife. Gale testified at the trial that when he asked Primeau why he was doing this, Primeau said that he wanted the woman to come downstairs so that he could kill her. Shortly after Primeau made that statement, however, both Primeau and Gale left the cellar through the broken window. As they were leaving, the intended victim turned on an outside light and saw a man running through her yard, away from her home.

The next day, Primeau was brought to a mental health clinic by his father. There was evidence that he had taken twenty-six

---

[2] Prior to this meeting, the defendant had asked Primeau if he needed a handgun, and Primeau had said he would get his own.

valium tablets, although at trial Primeau was confused as to whether he had taken the valium before or after his adventure at the intended victim's house. Eventually, Primeau asked to see the police, told them about the details of the murder agreement, and confessed that he had intended to kill the targeted victim.

1. The defendant's argument that his motions for required findings of not guilty should have been allowed is based on testimony by Primeau, furnished during the Commonwealth's case, to the effect that he had never actually intended to kill anyone. Although Primeau testified to the details of the murder agreement and to all the preparation and actions set forth above, he claimed at the trial that his undisclosed purpose was to obtain money from the defendant by means of his feigned agreement to the murder scheme. According to Primeau, he was engaged throughout only in "ripping [the defendant] off."

Based on Primeau's trial testimony about his subterfuge, the defendant argues as to the conspiracy charge that the existence of the requisite conspiratorial agreement was not proved because the Commonwealth failed to establish that he and Primeau ever mutually agreed to kill the intended victim. In support of his argument, the defendant directs our attention to decisions which hold, with respect to the mens rea requirement of conspiracy, that an illegal confederation cannot be found if one conspirator has simply feigned agreement to the plan. See *Sears* v. *United States*, 343 F.2d 139, 142 (5th Cir. 1965); *United States* v. *Chase*, 372 F.2d 453, 459 (4th Cir.), cert. denied, 387 U.S. 907 (1967); *King* v. *State*, 104 So.2d 730, 733 (Fla. 1958); *State* v. *Horton*, 275 N.C. 651, 657 (1969), cert. denied, 398 U.S. 959 (1970); *Delaney* v. *State*, 164 Tenn. 432, 435-436 (1932); *Williams* v. *State*, 646 S.W.2d 221, 223 (Tex. Crim. App. 1983). See also Fridman, Mens Rea in Conspiracy, 19 Mod.L.Rev. 276 (1956) ("Conspiracy is the agreement of two or more to effect an unlawful purpose. Two people cannot agree unless they both intend to carry out the purpose which is stated to be the object of their combination. Therefore there is no agreement, and consequently no conspiracy, where one of the two never intends to carry out the

unlawful purpose"). This is the so-called bilateral theory of conspiracy. The defendant criticizes other authorities which, in contrast to the above approach, look solely to the defendant's intent and formulate a so-called unilateral view of mens rea. See *Saienni* v. *State*, 346 A.2d 152, 154 (Del. 1975); *State* v. *St. Christopher*, 305 Minn. 226, 229-235 (1975); *People* v. *Smith*, 61 A.D.2d 91, 97 (N.Y. 1978). The substance of this approach is explained in the Model Penal Code.[3]

We do not have to become deeply involved in the question. "The crime, at least in this simple two-participant type of conspiracy, under Massachusetts law is complete upon the formation of an agreement and a combination to commit, or cause to be committed, a crime or an unlawful act. *Common-wealth* v. *Beneficial Fin. Co.*, 360 Mass. 188, 249-250 (1971),

---

[3] Comment 2 to § 5.03 (1) of the Model Penal Code (Official Draft and Revised Comments 1985) reads as follows:

"2. *Definition of Conspiracy.* . . .

. . . .

(b) *Unilateral Approach to Conspiratorial Relationship.* . . . "Sub-section (1) departs from the traditional view of conspiracy as an entirely bilateral or multilateral relationship, the view inherent in the standard formulation cast in terms of 'two or more persons' agreeing or combining to commit a crime. Attention is directed instead to each individual's culpability by framing the definition in terms of the conduct that suffices to establish the liability of any given actor, rather than the conduct of a group of which he is charged to be a part. This approach has been designated 'unilateral' . . . .

. . . .

*Second*: When the person with whom the defendant conspired secretly intends not to go through with the plan, it is generally held that neither party can be convicted because there was no 'agreement' between two persons. Under the unilateral approach of the Code, the culpable party's guilt would not be affected by the fact that the other party's agreement was feigned. He has conspired, within the meaning of the definition, in the belief that the other party was with him; apart from the issue of entrapment often presented in such cases, his culpability is not decreased by other's secret intention. True, the project's chances of success have not been increased by the agreement; indeed, its doom may have been sealed by this turn of events. But the major basis of conspiratorial liability, the unequivocal evidence of a firm purpose to commit a crime, remains the same." (Footnotes omitted.)

cert. denied, 407 U.S. 914 and sub nom. *Farrell* v. *Massachusetts*, 407 U.S. 910 (1972). *Commonwealth* v. *Corridori*, 11 Mass. App. Ct. 469, 476 (1981). See *Commonwealth* v. *Benjamin*, 3 Mass. App. Ct. 604, 618 & n.27 (1975); Nolan, Criminal Law § 443 (1976 & supp. 1981)." *Commonwealth* v. *Nighelli*, 13 Mass. App. Ct. 590, 593-594 (1982). Although there appears to be no Massachusetts decision directly on point, these authorities suggest that we subscribe to the bilateral theory for which the defendant contends. The trial judge gave the jury a thorough charge on the general Massachusetts law of conspiracy, explaining clearly the relevant principles set forth in the authorities cited in the *Nighelli* decision, *supra*. On the point in issue, the judge, taking into account the Commonwealth's bill of particulars and the authorities cited above, instructed the jury, in accord with the bilateral theory, that the Commonwealth had to establish mutual assent by Primeau and the defendant to an agreement to kill.[4] The dispositive question, therefore, is whether the evidence, viewed in its light most favorable to the Commonwealth, was sufficient to warrant a finding beyond a reasonable doubt that a conspiracy had been formed.[5] See *State* v. *St. Christopher*, 305 Minn. at 230 (Even

---

[4] The trial judge instructed, in part, as follows:

"So the essence is the agreement. No agreement; no conspiracy, if you don't have an agreement. Supposing I say to you 'Sure, I'll agree to rob that bank with you. It's a wonderful idea. I think we ought to have a very fast car though. I think we ought to have a Mercedes Benz car. Would you give me the money so I can go buy the Mercedes Benz car so we can use it to rob the bank?' You give me the money. All the time I'm laughing. As soon as you give me the money, I'm going to go to Las Vegas.

"You might have thought there was an agreement; but if there's no agreement, there's no conspiracy. We never really did conspire to rob the bank even though you thought we did, and even though you gave me the money, because there was no agreement. I fooled you.

"Conspiracy, the essence of conspiracy, if there's no confederacy, if there's no fusing, if there's no partnership, then there's no conspiracy, I cannot conspire alone; that's just evil thought."

[5] The defendant approaches the case from the wrong perspective by arguing, in substance, that the jury was required to accept Primeau's testimony that he had feigned agreement. This is not the test. The jury was free to

if there is evidence that one conspirator never intended to agree, the issue of conspiracy in a bilateral jurisdiction will be one for the jury if there is sufficient contrary evidence to warrant a finding that the disavowing conspirator did in fact intend to combine with the defendant to commit an unlawful act).

The Commonwealth's evidence satisfied this standard. Primeau testified that he had agreed to a murder contract. There was substantial circumstantial evidence supporting this testimony. This evidence involved, among other things, the preparation and actions taken by Primeau in order to accomplish the killing, including the purchase of two knives, practice using the knives as murder weapons (Primeau testified that because of practice he could hit a target the size of a half-dollar from some distance nine out of ten times), his efforts to recruit Gale, and his showing of the intended victim's picture to Gale with the statement that he had to "take care" of the woman. Finally, there was evidence of Primeau's remark to Gale in the basement that he wanted to lure the woman downstairs so he could kill her.[6]

---

disbelieve Primeau, as they undoubtedly did. The test is the one stated — whether the evidence most favorable to the Commonwealth warranted a finding of the disputed element of the crime. Of course, the bilateral-unilateral distinction is important in the giving of jury instructions. Here the judge instructed the jury on the bilateral theory of conspiracy, allowing them to reject, if they wished, Primeau's testimony disclaiming any conspiratorial intent.

[6] The defendant challenges the admission of Primeau's statement to Gale in the cellar as substantive evidence, contending that the evidence was admissible only to impeach Primeau's prior testimony that he had never intended to commit a murder. The record discloses that the evidence Primeau had told Gale about the murder while they were in the cellar was first brought out by the defendant's experienced trial counsel in his cross-examination of Primeau, that no objection was made when the prosecutor subsequently elicited the contents of the statement from Gale in direct examination, and that the argument that the testimony should be limited to impeachment only was advanced much later in the trial. In the circumstances, we think the judge was well within his rights to reject the argument. See, on the substantive point, *Commonwealth* v. *Lowe*, 391 Mass. 97, 105, cert. denied, 469 U.S. 840 (1984), and *United States* v. *Annunziato*, 293 F.2d 373, 377 (2d Cir.), cert. denied, 368 U.S. 919 (1961).

In light of this evidence, the conspiracy conviction was warranted.[7] We are of the same mind as to the evidence on the accessory charge. The evidence taken in a light most favorable to the Commonwealth on that charge was sufficient to warrant a finding by the jury that Primeau had an intent to kill at the time the armed break occurred.[8]

2. We turn to the claim that exculpatory evidence was withheld by the prosecutor. There was testimony that when Primeau talked to the police at the mental health center he told them that he had entered a murder agreement and had intended to kill the proposed victim. His testimony before the grand jury was to the same effect. Subsequent to his grand jury testimony, Primeau advised the prosectuor that, had the intended victim come downstairs while he was in her cellar, he would not have killed her. The prosecutor did not relay this specific information to defense counsel, believing it immaterial. The matter surfaced when Primeau claimed at trial that he had feigned agreement. On the second court day after the information came to light, the defendant's trial counsel moved for a mistrial on the ground

---

[7] The defendant urges us to conclude that the evidence supports as equally the proposition that Primeau was only "running a scam" as it does the charge of conspiracy to murder. If these theories are equally likely on the evidence, he argues, then the Commonwealth's case was not proved beyond a reasonable doubt and he should have been acquitted. He cites us to a conspiracy decision of this court, *Commonwealth* v. *Shapiro*, 10 Mass. App. Ct. 678 (1980), which applied the rule that evidence in a criminal case that leaves guilt and innocence equally likely mandates a required finding. His reliance on this case is misplaced. In *Shapiro*, the prosecution had offered no evidence, either circumstantial or direct, of active participation by the defendant in the claimed conspiracy; the only evidence was of her knowledge of the conspiracy. As a result, there was no evidence which, if believed, would have supported an inference of guilt over an innocent explanation of the facts. Here the prosecution presented, as we have seen, evidence of intent which the jury could have found outweighed the contrary evidence and was sufficient to support a finding of guilt beyond a reasonable doubt.

[8] The defendant also moved for required findings of not guilty at the conclusion of all the evidence. We find no deterioration in the Commonwealth's position as to proof at the close of the evidence. The renewed motions for required findings were correctly denied. *Commonwealth* v. *Basch*, 386 Mass. 620, 622 n.2 (1982).

that exculpatory information had been withheld. The trial judge, after a hearing, denied the motion.

The prosecutor concluded that the information was immaterial.[9] Given the state of the proof, however, we think the information should have been disclosed because "prosecuting attorneys [should] become accustomed to disclosing all material which is even possibly exculpatory, as a prophylactic against reversible error and in order to save court time arguing about it." *Commonwealth* v. *St. Germain*, 381 Mass. 256, 262 n.10 (1980), quoting from Commentary to A.B.A. Standards for Criminal Justice, Standards Relating to Discovery and Procedure Before Trial 2.1 (d) (Approved Draft 1970). We look then for prejudice, examining "the consequences of the delay and . . . ask[ing] whether the prosecution's disclosure was sufficiently timely to allow the defendant 'to make effective use of the evidence . . . .' " *Commonwealth* v. *Wilson*, 381 Mass. 90, 114 (1980), quoting from *Commonwealth* v. *Adrey*, 376 Mass. 747, 755 (1978). In inquiring about prejudice, we also keep in mind that the trial judge possesses discretion in deciding a motion for mistrial and that the judge's discretion is "much broader than ours." *Commonwealth* v. *Baldwin*, 385 Mass. 165, 177 (1982). See *Commonwealth* v. *Lam Hue To*, 391 Mass. 301, 309-310 (1984).

Applying these standards, we decline to disturb the denial of the motion. The defendant's counsel did not seek a continuance to deal with the information that Primeau would not

---

[9] The prosecutor indicated at the hearing on the motion for mistrial that Primeau's testimony that he never intended to enter a conspiracy, or to commit any crime, came as a complete surprise. While the prosecutor had known before trial about Primeau's assertion that he would not have killed the intended victim had he encountered her, the prosecutor reasoned that the conspiracy was complete when the agreement was made. The prosecutor in following this rationale took Primeau's statement as indicating that Primeau had conspired with the defendant to kill the victim but that Primeau had gotten cold feet at the end. Consequently, the prosecutor dismissed the statement as unimportant. The defendant's counsel agrees that the prosecutor acted in good faith and that he had not purposely suppressed relevant information. However, good faith on a prosecutor's part will not remedy a nondisclosure of exculpatory material otherwise sufficient to require a mistrial or other corrective action.

have killed the victim. At the time of disclosure, the defendant's trial counsel had not made an opening statement and had not committed himself to any theory inconsistent with the defense which was ultimately put forward. Moreover, " [d]efense counsel carried out a thorough and searching cross-examination of the witness. He was quite effective in highlighting the discrepancies" in Primeau's testimony. *Commonwealth* v. *Baldwin*, 385 Mass. at 176. Keeping in mind that Primeau's principal disclosure at trial — that he never intended to enter an agreement at all — came as a surprise to both sides, we perceive nothing concrete in the record to support the defendant's assertion that his preparation or strategy would have been different had he known in advance the small piece of information that had been withheld. Indeed, the core of the defense, to the effect that Primeau was completely untrustworthy and had only intended to steal the defendant's money, was forcefully presented to the jury. Like the trial judge, we can discern no visible harm that was suffered by the defense.

*Judgments affirmed.*