COMMONWEALTH vs. PAUL PIZZOTTI.

No. 88-P-1007.

Middlesex.   March 15, 1989. — May 25, 1989.

Present: DREBEN, KAPLAN, & FINE, JJ.

*Practice, Criminal*, Discovery, Disclosure of evidence, Suppression of evidence by prosecutor, Argument by prosecutor, Instructions to jury. *Rape. Evidence*, Relevancy and materiality. *Indecent Assault and Battery*.

A defendant charged with rape and assault and battery was not prejudiced by any delay in the prosecution's disclosure of a sanitized photograph of the defendant and an enlarged photograph of the victim showing facial bruises, both pictures having been taken shortly after the incident, where it was unclear how the defense would have altered any tactic if the photographs had been disclosed earlier and where, despite alleging surprise at the severity of the victim's injuries disclosed by the enlarged image, the defense had access to medical records, the grand jury testimony, and the original photograph of the victim. [381]

A defendant charged with rape was not prejudiced by any delay in the prosecution's disclosure of a writing prepared by a nurse who had examined the victim which should have formed a part of the medical record and which, the defense claimed, contained "extremely inculpatory evidence as to penetration of the [victim] by the defendant," where no part of the medical record was offered in evidence, where the nurse's writing related only to fresh complaint, in which it was largely duplicative of testimony by others, and where, in fact, the jury acquitted the defendant of rape. [381-382]

A defendant charged with rape was not prejudiced by the prosecution's failure to disclose certain possibly exculpatory information which a prosecution witness withheld from the grand jury but related orally to the prosecution and testified to at trial, where defense counsel confronted the witness on cross-examination and recross-examination with her failure to report the information to the police or grand jury in contrast to her testifying at trial to the expanded version; where the witness was but a corroborating witness; and where, in fact, the jury acquitted the defendant of rape. [382-383]

A defendant charged with rape was not prejudiced by the circumstance that, at the time the prosecutor successfully moved in limine to bar the defense from inquiring whether the victim was pregnant, the prosecutor knew

that a prospective prosecution witness believed her son to be the father of a child the victim was carrying, where, although the prosecutor was not so forthcoming as he should have been, the possible partiality of the witness was brought out clearly at trial. [383-384]

At a rape trial, evidence of the defendant's attitude toward the victim both before and after the victim, pregnant with his child, had decided against an abortion, was properly admissible as a means of assessing the conflicting stories told by the principals and thus deciding what happened at the time of the alleged rape; the evidence was also relevant to the defendant's claim of consent to penetration. [384]

At a rape trial, remarks by the prosecutor in closing argument, which recalled the whole relationship between the defendant and the victim prior to the alleged rape, were proper. [384]

At a rape trial, the judge did not err in instructing the jury, over objection, on the crime of indecent assault and battery where, on the evidence, there was a basis for acquitting the defendant of rape and finding him guilty of that lesser included offense. [384-385]

INDICTMENTS found and returned in the Superior Court Department on April 22, 1987.

The cases were tried before *Barbara J. Rouse*, J.

*George Hassett* for the defendant.

*Rosemary D. Mellor*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. Tried on two counts of rape, G. L. c. 265, § 22(*b*), charging, respectively, penetration by finger and by tongue,[1] the defendant Pizzotti was acquitted of the first charge, and found guilty, under the second charge, of the lesser offense of indecent assault and battery, G. L. c. 265, § 13H. He was also found guilty of another assault and battery, G. L. c. 265, § 13A.[2] The defendant appeals from the judgments of convic-

---

[1] Reading the indictments as controlled by bills of particulars.

[2] For the indecent assault and battery, the defendant was sentenced to two years in a house of correction, six months to be served, the balance suspended for two years, with two years probation; for the assault and battery, a concurrent sentence of two years in a house of correction, suspended for two years, with two years probation.

tion, protesting prosecutorial misconduct, erroneous admission of evidence, and fault in allowing the jury to consider the lesser offense.

The jury could accept the following as told mostly by the victim, Carol (pseudonym), aged eighteen at the time of the incident. She and the defendant were in high school together, and were intimate while there. She became pregnant by him. She told him she intended to have an abortion. He was sympathetic and offered to pay for the procedure. A couple of weeks later, she changed her mind. The relationship soured; the defendant said he wanted nothing to do with her, and the two did not communicate during the last four months of the pregnancy.

In May, 1986, the child was stillborn. A month later there was a moment of reconciliation between Carol and the defendant, but bitterness or hostility arose intermittently. In particular, in July, there was a flare up when the defendant refused to look at photographs of Carol holding the stillborn baby. Yet in fall and winter, 1986-1987, the two dated occasionally and had intercourse at least once, perhaps in October.

On Friday, April 3, 1987, Carol met after work with two girlfriends; they shared a pizza, then drove to the parking lot of the Arlington housing project where Carol lived, and remained there until 8:00 P.M. Carol had three beers and shared a marihuana cigarette. The three young women went to the lounge of a Cambridge restaurant. Over a three-hour period, Carol had five or six mixed drinks. Around midnight, Carol left with a friend, Eddie Capaso, who drove her back to the housing project in her car. Parking in a nearby unlit, marshy area called "the back," they "necked" a while, but when Carol refused to go further, Eddie left. Carol found that the car was stuck in the mire. As she could not drive out, she walked to the project and sought help. Carol waited at the project while Eddie was having a try at moving the car. Just then the defendant approached. Carol, still angry over a conversation with him a month earlier, turned away without speaking.

Five minutes later Carol commenced returning to "the back" to find Eddie. The defendant followed and asked to walk with

her. She refused, then relented. On the way to the car, the two kissed, but when the defendant began to fondle her breasts, Carol balked and said "I don't think we should be doing this." The defendant in anger put his foot behind hers, and tripped her. She fell with her back to the ground. The defendant got on top of her. She screamed, "Stop it, get off of me," and struck at him with her hands. They struggled. The defendant pulled at Carol's bra, stroked her breasts, then pulled down her pants and underwear. He put his finger deep into her vagina,[3] then changed his position, put his head between her legs, bit her in the area of her inner thighs and genitals, and inserted his tongue into her vagina. Carol was then able to kick him off. She rolled over and stood. They argued and called names. Carol hit out at him but, blocking her punches, he struck below her left eye, which spun her about and drove her to the ground face down. She screamed, "My face. What did you do to my face." The defendant left.[4]

Carol went direct to the home of Dorothy Gorman, a family friend, at the project. Banging on Gorman's door, she yelled "Don't let him get me." Gorman saw Carol was hurt; her face was swollen about the eye and bleeding. Carol stayed the night. The following morning Carol's mother brought her to a Health Stop Clinic. There Officer Shaun O'Halloran of the Arlington police spoke with her. After treatment at Symmes Hospital in Arlington, to which she was transferred, she told Nurse Diane Mazurek what happened and spoke with Sergeant James Moran and again with O'Halloran.

As noted, the foregoing reached the jury largely through Carol's testimony. The Commonwealth offered evidence of "fresh complaints." Gorman confirmed that Carol was trembling and screaming "Help, he raped me." As Gorman was cleaning blood and dirt from Carol's face, Carol said, "He ate me; I tried to kick him and to stop him, but I couldn't stop

---

[3] See below: the defendant admits inserting his finger, but says Carol consented to this.

[4] Susan Janowitz, who lives in a house abutting "the back," testified she was awakened by shouts at 2:30 or 3:30 A.M. and heard a woman scream "Stop it. Leave me alone." Shortly afterward she saw a woman leave the area.

him; it was disgusting and I feel dirty."[5] Again, "He put something in me, but I don't know what it was." Nurse Mazurek related that Carol said the defendant put his hand or fingers into her, and "He kept biting me between my legs," and "I feel so dirty and embarrassed."[6] Sergeant Moran in his testimony, recounting what Carol told him, carries her story through the attack short of any penetration; the rest is lost to us because of defective recording of the testimony.[7] (We return below to the witnesses Mazurek and Gorman.)

The defendant took the stand to say he and Carol walked hand-in-hand, kissed, and lay down side-by-side at "the back." He put his finger in her vagina, she held his penis. When he took down her pants, she said no. He began to leave. She "freaked out," began calling him names and hitting him. He pushed her away and she fell on her face. He denied all else.

The treating physician at Symmes Hospital, Dr. Michael S. Erdos, called by the defense, said he found no bruises in the areas of the inner thighs or vagina, nor conclusive evidence of sexual assault. He confirmed the bruises to the face. On cross-examination he said he would not expect a pain-causing digital penetration to leave a bruise if the victim was not struggling at the time. Biting the vagina might cause pain without leaving marks detectable upon examination twelve hours later.

Officer O'Halloran, also called by the defense, in his account of what Carol told him, had Carol "blacking out" after the defendant tripped her and tore her bra. She awoke to find her pants and underwear down. Name calling followed. (O'Halloran's recollection differed in other details also from Carol's testimony.)

Despite some variances among the witnesses, the jury verdicts were supported by the evidence. This is not contested.

1. *Prosecutor's conduct.* We examine each of the claims of misconduct by the prosecutor in his handling of evidence.

---

[5] Carol, however, testified she had not mentioned the oral intercourse to Gorman.

[6] Carol was menstruating at the time.

[7] Carol said she told Moran the defendant put something in her vagina.

(a) Received in evidence on the part of the Commonwealth were a (sanitized) photograph of the defendant and an enlarged photograph of Carol showing facial bruises, both pictures taken shortly after the incident. These pictures were within the scope of the discovery required of the Commonwealth, and were relevant, but the defense was not handed them until the morning of trial, when it learned that the prosecutor would offer them in evidence. At a hearing that morning the defense raised objections to their introduction which were overruled. Defense counsel doubtless knew of the first picture and had been previously provided with the second, but in the ordinary, unenlarged form. The primary question is not what may have been the impact of these pictures when introduced, but whether the defendant was prejudiced by the delay in their discovery. See *Commonwealth* v. *Cundriff*, 382 Mass. 137, 149-151 (1980), cert. denied, 451 U.S. 973 (1981); *Commonwealth* v. *Baldwin*, 385 Mass. 165, 175 & n.10 (1982). We do not see how the defense would have altered any tactic if it had been informed earlier; indeed, a continuance was not sought. See *Commonwealth* v. *Richenburg*, 401 Mass. 663, 671 (1988).

The defense says it was surprised by the severity of Carol's injuries disclosed by the enlarged image, but it had access to medical records, the grand jury testimony of Carol and Gorman, and, as noted, the original photograph.

(b) The prosecutor furnished the defense with a three-page medical record made at Symmes Hospital. The week before trial, however, in the course of a conversation with Nurse Mazurek, the prosecutor learned that this witness had prepared an additional writing which formed part of the medical record. He called the hospital, received the added record on the Friday before the Monday (November 9, 1987) when trial commenced, and gave discovery Monday morning. The defense protested at the morning hearing that this portion of the record contained (as its brief states) "extremely inculpatory evidence as to penetration of the complainant by the defendant orally and digitally." However, no part of the medical record at the hospital was offered in evidence. As indicated above, Mazurek's recital of what Carol told her gave some corroboration of digital

penetration, but did not quite corroborate oral entry. The defense did not attempt to use the added record as a means of contradicting Mazurek.

Mazurek's testimony related only to fresh complaint, in which it was largely duplicative of testimony by others. See *Commonwealth* v. *Vieira*, 401 Mass. 828, 834 (1988). Such delay of discovery as is chargeable to the prosecutor appears to have had a null effect on the defense.[8] In fact the jury acquitted the defendant of both charges of rape.

(c) To return to the witness Gorman, it appeared that when she testified before the grand jury, she did not mention Carol's saying "He ate me" or that the defendant "put something inside me"; nor do these words appear in her written statement to the police. She later vouchsafed the added information to the prosecutor. Defense counsel complained that the prosecutor had not informed him of the fact. The judge seemed to accept the prosecutor's explanation that, under the pretrial conference report controlling discovery, he was not required to disclose Gorman's statement to him not reduced to writing. But he was bound under the conference report to furnish "any facts of an exculpatory nature," and although a question could be raised whether a matter affecting the credibility of a witness who was not "key" qualified as "exculpatory" (compare *Commonwealth* v. *Ellison*, 376 Mass. 1, 22 [1978], with *Commonwealth* v. *Adrey*, 376 Mass. 747, 754 [1978]), the prosecutor might well have taken to heart these words: "[P]rosecuting attorneys [should] become accustomed to disclosing all material which is even possibly exculpatory, as a prophylactic against reversible error and in order to save court time arguing about it." *Commonwealth* v. *St. Germain*, 381 Mass. 256, 262 n.10 (1980) (adopting language from an A.B.A. commentary on a proposed standard for criminal justice).

There was, however, no prejudice to the defense. On cross- and recross-examination defense counsel elicited from Gorman and confronted her with her failure to report Carol's supposed

---

[8] We may add that the judge ruled at the morning hearing that objection should be renewed when the added record was introduced; it was not renewed, as the record was not offered.

entire statement to the police or grand jury, contrasted with her testifying to the fuller version. (This attack might be especially effective in the light of Gorman's relationship to Carol; see part (d) below.[9]) We may note, too, as in the case of Mazurek, that Gorman was but a fresh-complaint (i.e. corroborating) witness, and the jury acquitted of the rape charges.

(d) A further problem regarding Gorman: The Commonwealth had moved in limine to bar the defense from inquiring at trial whether Carol was pregnant. As the prosecutor represented that the defendant was not the father, the defense did not oppose the motion. Under cross-examination Gorman let fall that in the past year her son had dated Carol. The defense became wary and requested a voir dire of the witness. At this point the prosecutor averred that Carol and Gorman believed the son was the father and that Gorman learned this some four months after she testified before the grand jury. The defense moved for a mistrial on the ground that the prosecutor knew who the father was when he made the motion in limine. The motion was denied, as was a motion for a voir dire on whether the prosecutor withheld exculpatory evidence — the identity of the father, as affecting Gorman's credibility. The judge took the view that the facts not disclosed by the prosecutor were "probative on the issue of bias," but not of the exculpatory type. The prosecutor then brought out the facts from Gorman on redirect examination. On recross the defense emphasized the point that Gorman, testifying for the Commonwealth, was the prospective grandmother of the child Carol was bearing.

Here, too, it is hard to see prejudice, for Gorman's possible partiality was brought out clearly. Yet defense counsel was right to protest, "I've heard this before, that because of my effective cross-examination, it eliminates all the problems." On the whole record our judgment is that the prosecutor was not as forthcoming as he should have been; he did not act in

---

[9] Gorman explained, however, that she wanted to save Carol from embarrassment and so did not come forward with the added information until after she learned that Carol had told it to the grand jury. The prosecutor brought out that Gorman made her statement to him not long after Carol testified before the grand jury.

the spirit of the *St. Germain* case, quoted above. See also *Commonwealth* v. *Themelis*, 22 Mass. App. Ct. 754, 762 (1986). The defendant was fairly convicted, and the prosecutor's attitude, possibly an unthinking attitude, was not such as to warrant particular corrective action. Still the fault should not pass unnoticed.

2. *Admission of evidence; closing speech.* Under examination by the Commonwealth, Carol was allowed, over objection, to testify to the defendant's attitude toward her before and after she decided against an abortion. There was no error. The jury needed to know the course of the relationship as one means of assessing the conflicting stories told by the principals and thus deciding what happened on April 4. The evidence was relevant to the defendant's claim of consent to digital penetration. See *Commonwealth* v. *Bradshaw*, 385 Mass. 244, 269-270 (1982); *Commonwealth* v. *Silva*, 401 Mass. 318, 322 (1987).

In the same light, we deal with remarks by the prosecutor in closing to the jury. Carol had testified that the defendant broke off when she decided to have the baby. To the contrary, the defendant testified that it was Carol who became uncommunicative. "What kind of person was that that told you about it?" the prosecutor asked. In context, this was not an attack on the defendant as a bad person who had committed "bad acts." The prosecutor was recalling the whole relationship of the couple and suggesting that more likely it was the defendant, not Carol, who turned hostile and silent. The prosecutor indeed said (somewhat incoherently, as was the case with other parts of his speech), "Pizzotti is not on trial for being a bad person, or for this kind of conduct; that's not why, it is just that these things give you an insight into the person, to let you understand how much credibility to his testimony, to let you understand how he would have reacted in that situation." We add that the defense took no objection to the closing speech at the time.

3. *Instruction.* The judge did not err in instructing the jury, over objection, on the crime of indecent assault and battery. On the evidence there was a basis for acquitting the defendant of a rape and finding him guilty of that "lesser included"

offense. See *Commonwealth* v. *Santo*, 375 Mass. 299, 305 (1978); *Commonwealth* v. *Sherry*, 386 Mass. 682, 694-695 (1982).[10] A judge need not fall in with a defendant's desire to gamble on the jury's acquitting him of the larger crime if that crime were put to them without the other choice.

*Judgments affirmed.*

---

[10] See, e.g., the testimony of Nurse Mazurek that Carol spoke of the defendant's biting her between the legs but did not mention his entering her vagina orally.